## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Sterling Bank and Trust, F.S.B. AND Sterling Bancorp, Inc., | Civil Action No. _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | Jury Trial Demanded |
| Scott Seligman, | |
| Defendant, | |
| and | |
| K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, Scott J. Seligman Revocable Living Trust, Joshua James Seligman Irrevocable Trust No. 1, Seligman Family Foundation, 311 California LP/tax Kiss LP CO, Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman & Associates, Inc., AND Seligman Administrative Office | |
| Nominal Defendants. | |

Plaintiffs Sterling Bank and Trust, F.S.B. (the "Bank") and Sterling

Bancorp, Inc. (the "Holding Company" and together with the Bank, "Plaintiffs" or

"Sterling"), by and through their undersigned counsel, bring this civil action

against Defendant Scott Seligman ("Defendant" or "Seligman") and Nominal

Defendants K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term
Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust,
Scott J. Seligman Revocable Living Trust, Joshua James Seligman Irrevocable
Trust No. 1, Seligman Family Foundation, 311 California LP/tax Kiss LP CO,
Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman & Associates,
Inc., and Seligman Administrative Office (together, "Nominal Defendants"), and
for cause state:

## INTRODUCTION

1.  This case is about how Seligman, Sterling's founder and controlling
shareholder, exerted near total control over Sterling, and how he developed and
directed a multibillion dollar loan program that enriched Seligman but left Sterling
in the crosshairs of government regulators, enforcement agents, criminal
investigators, class action plaintiffs, and shareholders.  Seligman caused the sale of
his personal shares of common stock of the Holding Company in connection with
the Holding Company's initial public offering ("IPO") (taking significant IPO
proceeds for his and his family's benefit) based on an inflated valuation.  When the
truth about his dishonest and reckless design and operation of the Bank finally
came to light, despite Seligman's best efforts to keep it concealed, Sterling was
forced to pay the price for his wrongful actions, including to spend many millions
of dollars to make things right with multiple government agencies, law

enforcement, and innocent minority shareholders.  Seligman also directed
Sterling's resources to Seligman-affiliated entities and extracted millions of dollars
in dividends.  Through all these actions, he improperly enriched himself by more
than $100 million.

2.  By his actions and inactions—most notably with respect to the operation of
the Bank's flagship Advantage Loan Program—Seligman elevated his own
interests over Sterling's.  In doing so, Seligman breached his fiduciary duties to
Plaintiffs.  Compounding the damage to Plaintiffs, Seligman continues to retain the
benefit of Plaintiffs' payment of shareholder dividends to him, as well as of
Plaintiffs' payments made to Seligman-related entities, an unjust and inequitable
result due to Seligman's wrongful and near-tyrannical control that he wielded over
all of Sterling.

3.  For these reasons, as further described below, the Court should hold
Seligman accountable for using his power and influence over Sterling to enrich
himself at Plaintiffs' expense, award damages to Plaintiffs to make them whole for
the costs they have incurred in their efforts to remedy the issues that Defendant
directly caused, order Seligman to disgorge the benefits he received from his
breach of duty, order Seligman to return to Plaintiffs his dividends and the
payments made to the Seligman Family Foundation, 311 California LP/tax Kiss LP
CO, Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman &

Associates, Inc., and Seligman Administrative Office, and order Seligman to (i)

surrender his shares in the Holding Company, including those held in K.I.S.S.

Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty

Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, Scott J. Seligman

Revocable Living Trust or (ii) transfer those shares to a trust with a new

independent trustee who would vote those shares in accordance with the votes of

the minority shareholders so that Sterling is no longer subject to Seligman's

control and which new trust would serve as a source of financial strength for

Sterling.

## **JURISDICTION AND VENUE**

4.  This Court has subject matter jurisdiction under 28 U.S.C. §1332(a).

Plaintiffs are both citizens of Michigan, and Defendant is a citizen of California.

Thus, Plaintiffs and Defendant are citizens of different states.  The citizenship of

Nominal Defendants is disregarded under 28 U.S.C. §1332(a).  Additionally, the

amount in controversy exceeds $75,000, exclusive of interest and costs.

5.  Venue is proper in this district under 28 U.S.C. § 1391.  A substantial part of

the events or omissions giving rise to this action occurred here.

## **PARTIES**

6.  Sterling Bank and Trust, F.S.B. is a federally insured depository institution

established in 1984 that offers a range of residential and commercial loan products,

as well as retail banking services.  The Bank is headquartered in Southfield,
Michigan, and has nearly 30 branches:  20 in the San Francisco area, six in greater
Los Angeles, one in New York City, and its headquarters' branch in Michigan.  As
a financial institution, the Bank must comply with the Bank Secrecy Act, the USA
PATRIOT Act, and other laws and regulations that require financial institutions to,
among other duties, institute and maintain an effective anti-money laundering
program and to file timely reports such as suspicious activity reports and currency
transaction reports (also known as "BSA/AML" requirements). The federal
banking agencies and the Financial Crimes Enforcement Network ("FinCEN") are
authorized to impose significant civil money penalties for violations of those
requirements.

7.  The Bank is a wholly owned subsidiary of Sterling Bancorp, Inc., a unitary
thrift holding company headquartered in Southfield, Michigan, and incorporated in
Michigan in 1989.  The Holding Company's primary business is the operation of
the Bank.

8.  Defendant Scott Seligman is domiciled in California.  On information and
belief, Seligman's primary residence is located in California, where he spends most
of his time and conducts most of his personal and professional activities, including
a partial ownership interest in the San Francisco Giants.

9.   In 1984, Seligman chartered the Bank, then known as Sterling Savings and Loan Association.  At all times relevant to this Action, Seligman served as consulting director to the Board of the Bank, Vice President of the Holding Company, and, through various personal and family trusts, controlling shareholder of the Holding Company.

10. The Nominal Defendants are affiliated with and controlled by Seligman.

11. Seligman formed K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, Scott J. Seligman Revocable Living Trust, Joshua James Seligman Irrevocable Trust No. 1.  Each of these trusts possesses Sterling shares and/or funds that are the subject of this litigation.

12. The Seligman Family Foundation is operated by The Seligman Group, a private real estate and investment company founded in 1954 by Irving R. Seligman (Seligman's father).  Seligman currently is the Chairman of The Seligman Group and previously served as its President, Vice President, Director, and Chief Operating Officer.  The Seligman Family Foundation possesses funds that are the subject of this litigation.

13. 311 California LP/tax Kiss LP CO, Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman & Associates, Inc., and Seligman Administrative

Office are all business entities owned and controlled by Seligman, and each possesses funds that are the subject of this litigation.

## STATEMENT

14. Seligman exerted control over every aspect of Sterling's operations and business strategies, from the minutiae of everyday life at the Bank's branches to the high-level decisions that controlled the direction the Bank would take for months and years to come. Seligman leveraged his status as founder and controlling shareholder to rule by fear and ridicule and create an atmosphere in which what he said, went. He did so with one goal in mind: to increase his own profits at any cost, and without regard for the Bank's obligations under BSA/AML rules and regulations or other principles of safe and sound operation. For Sterling, that cost was steep. Defendant enriched himself by more than $100 million, and Sterling was left holding the bag.

**A.    Seligman's History and Roles with the Bank and Holding Company**

15. Irving R. Seligman, Defendant's father, founded Seligman & Associates, Inc. in 1954.

16. In 1976, Defendant became Group Vice-President of Seligman & Associates, Inc., and in 1984, he chartered the Sterling Savings and Loan Association. In 1993, with the addition of a Trust division, Sterling became

Sterling Bank and Trust, F.S.B.  Defendant served as Chief Executive Officer of the Bank until 1999.

17. From 2000 through the end of 2019, Defendant was a Consulting Director to the Bank's Board of Directors.  In 2010, at the behest of the Department of Treasury, Office of Thrift Supervision, the Bank formalized Seligman's role as Consulting Director.  At various other times, Seligman similarly has been referred to as an "advisory director" to the Bank.

18. Additionally, from 2000 through the end of 2019, Seligman was a Vice President of the Holding Company.

19. Until the Holding Company's IPO in 2017, Seligman, members of his family, and various family trusts owned 100% of the Holding Company. Following the IPO, Seligman, members of his family, and various family trusts owned 70% of the Holding Company.  And, through K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, and Scott J. Seligman Revocable Living Trust, which he established and effectively controls, Seligman has a controlling interest in the Holding Company, beneficially owning 47% of the Holding Company's common stock and voting power.  This is in addition to the holdings of Seligman's

family members who in recent years have disclaimed any common ownership with Seligman.[1]

20. Seligman leveraged his positions as founder, Consulting Director to the Bank, and Vice President and controlling shareholder of its Holding Company to exercise power, influence, and control over Sterling's affairs, its employees, and its top-level management.  Indeed, Sterling reported as much on numerous occasions, writing in the Holding Company's October 19, 2017, S-1 filing, for example, that "Scott Seligman, the founder of the Bank, Vice President of the [Holding] Company and consultant to the Bank's board of directors, represents the interests of the family and continues to serve in an advisory capacity to the [Holding] Company and the Bank, including through attendance at board meetings and frequent consultation with senior management. Therefore, Mr. Seligman will continue to have access and influence with respect to [Holding] Company operations."

---

[1] As noted, other members of Defendant Seligman's family own, personally and through familial trusts, additional percentages of the Holding Company's common stock. For a period of time, certain of these family members utilized the same person to serve as trustee of their family trusts as Seligman himself used for his family trusts, thus creating a commonality in beneficial ownership and creating the appearance to the outside world that Seligman controlled all of the family holdings.

### B.   Participation in the Conduct of the Affairs of Sterling

21. Defendant engrained himself in, and wielded control over, all aspects of Sterling's affairs, from its upper-level management to its lower-level employees.

22. For example, Defendant attended Holding Company board meetings, and he was involved in committees that oversaw the operations of the Bank.  In fact, Defendant—or his agent, Stephanie Zimmerman, on his behalf—attended nearly every, if not every, Holding Company and Bank board meeting.

23. Defendant frequently called for, attended, and/or participated in meetings of the Bank's executive management, from monthly residential loan production meetings and mortgage meetings to strategic review meetings and California update meetings.

24. In fact, Seligman instituted a monthly "shareholder" meeting in which the Bank's top management, Chief Executive Officer and President of Commercial and Retail Banking Gary Judd; President, Chief Operating Officer, and Chief Financial Officer Thomas Lopp; and Chief Lending Officer Michael Montemayor, would travel to San Francisco to meet Defendant in his office to discuss all aspects of the Bank's business, both residential and commercial.  Seligman also instituted monthly meetings with other Bank management, including Steve Adams, Bill Vowler, and Nathan LaBudde, to discuss matters falling under their purview.

25. From January 2017 to December 2019, Seligman attended dozens, perhaps hundreds, of the Bank's regular management meetings.  And he was an active participant in many of these meetings, weighing in on a range of issues both big and small.

26. In addition to his attendance at these formal meetings, Defendant generally controlled the Bank's management and daily affairs.  His near-tyrannical control over the Bank's management often led to them ceding to Defendant's desires, demands, and directives, even those that were not in the best interest of the Bank, and in doing so they abdicated their own duties to the Bank.  Defendant dictated or directed nearly every significant action, and many insignificant actions, at the Bank.

27. Defendant often directed the Bank's spending.  For example, he dictated marketing and advertising efforts.  Defendant also directed the purchase of other companies' loans, instructing, for example, Montemayor to buy loans from one of Defendant's acquaintances.  And he directed and oversaw the lease of real estate and purchase of goods for new branches, including furniture and other décor to match the design "theme" that he selected for that location.  For example, he decided that one branch location would have an "aviation" theme and selected expensive desks made of old airplane parts to match.  He also directed the purchase

of "greeter robots" for various branches that were programmed to greet customers and could also perform other functions like singing, dancing, or playing cards.

28. Defendant also was closely involved in hiring, firing, and other personnel decisions at the Bank and its branches. He directed changes in new hiring and training policies, oversaw hirings and firings, instructed Bank supervisors about what he deemed to be the appropriate roles and responsibilities of their employees, and directed other personnel-related decisions such as department organization and employee compensation.

29. In addition, on many occasions Defendant issued tasks and directives to Bank employees of all levels, including criticizing and instructing senior management to change or implement various business practices. Defendant made clear that when he suggested an employee do something, that was justification enough for it to be done, and to be done quickly. To employees, Defendant was a bully, and they feared that if they did not abide by his directives, they would be sidelined, demoted, or terminated.

30. For example, Defendant often directed Bank employees to generate and deliver to him reports and spreadsheets on various business metrics, like the "Flash Report". These spreadsheets and reports kept Defendant apprised of the Bank's loan pipeline in real-time and informed his control over the Bank's operations. If

and when Defendant discovered that the Bank was falling behind in any business activity or metric, he immediately demanded answers and issued directives that he thought would remedy the situation. These directives often were accompanied by harshly worded emails or tirades, designed to instill fear in the employee to execute Defendant's request.

31. Defendant even instructed employees about and inserted himself into menial business activities, including to specify the appropriate personnel and situations in which to send all-company emails or whether employees should be eating chips at their desks. In addition, he inserted himself into the day-to-day life of lower-level Bank staff, including into disputes that arose between and among employees, and between and among employees and their supervisors. In fact, when he was not present in the Bank's corporate offices, Seligman used a robot with video and audio capabilities to travel throughout the Bank's offices and check in on various employees, and this robot was referred to as the "Scott Bot."

32. As yet another example of his unbridled attempts to control aspects of the Bank's affairs, large and small, Defendant once decided that he wanted the Bank's branches to sell commemorative coins, which he had procured from the United States Mint. Bank personnel informed Defendant that the Bank first needed to obtain sales licenses and sort out any tax implications associated with the sales of the coins, but Defendant was openly hostile to those perceived roadblocks. The

Bank did ultimately begin selling the commemorative coins at his insistence, and it turned out to be a fruitless endeavor.

33. Defendant viewed the Bank as *his* business and created an atmosphere in which what he said, went. So, in 2017, when Defendant decided he wanted to take the Holding Company public, the process began in earnest, and Defendant exerted pressure on the Holding Company's Board and the Bank's management to get it done quickly. Defendant was deeply involved—either personally or through his proxies—in the development of the Holding Company's IPO process, including the sum and substance of meetings in preparation for the IPO and of investor and disclosure materials associated with the same. He also met with potential investors in advance of the IPO and had direct communications with the IPO underwriter, Sandler O'Neill. Ultimately, under Defendant's direction, supervision, and control, the Holding Company went public on November 17, 2017.

34. In no area was Seligman's involvement, control, and influence more complete than it was with respect to the Advantage Loan Program (the "ALP"), to Sterling's detriment.

### C. Overview of the Advantage Loan Program

35. The ALP began in 2011 as a stated-income loan program.

36. The Bank advertised that it offered the Advantage Loan to underserved homebuyers who had good credit but may have limited credit history. In

particular, the Program was marketed toward Chinese Americans or Chinese nationals purchasing homes in the United States who had the funds but may have lacked the usual documentation, including documentation relating to sources of down payments, required for a mortgage.

37. The program required a minimum 35% down payment and charged higher interest rates and fees than were available elsewhere in the market, but it did not require submission of typical documentation, such as an applicant's tax returns or payroll records.  Indeed, at its inception, verification of employment was initially done by phone, and income was not verified.  The applicant's stated income simply had to "make sense" for their occupation.

38.  Advantage Loans remained stated-income loans until the Consumer Financial Protection Bureau's Ability to Repay rule, 12 CFR Part 1026, went into effect in January 2014.

39. The Ability to Repay rule requires a reasonable and good faith determination by a mortgage lender that the borrower is able to repay the loan. The lender is required to verify information it relies on to make the ability to repay determination, using reasonably reliable third-party records.

40. In October 2013, the Bank revised its credit policy for the ALP to comply with the upcoming effective date of the Ability to Repay rule.

41. Defendant knew the Ability to Repay rule would negatively impact the origination of Advantage Loans.  And so, as further described in the next section, Seligman exerted pressure on Bank employees to originate Advantage Loans with no regard for, and in violation of, the Ability to Repay rule and the Bank's new credit policies, and without implementing the minimal guard rails to ensure compliance with those requirements.  Seligman also exerted pressure on Bank employees to originate Advantage Loans with no regard for, and in violation of, certain BSA/AML requirements, as determined by the Department of Treasury's Office of the Comptroller of the Currency ("OCC") in its June 2019 formal agreement with the Bank.

> **D.**     **Seligman's Influence on the Day-to-Day Operations of the Advantage Loan Program**

42. Seligman was deeply involved in the design, development, and implementation of the ALP, and the policies underlying it.  And during the ALP's life, he put increasing pressure on the Bank's management and employees to increase its lending volumes.

43. Bank management at the time received frequent angry calls from Defendant, or emails at all hours of the day and night, whenever Seligman felt that the ALP was falling short of his expectations.  Defendant cowed management to move slowly to discipline certain employees they suspected of violating the Bank's policies with respect to the ALP out of a concern that Defendant would be upset at

any disciplining of high producing loan officers. By giving in to Defendant's pressure, Bank management violated their own independent duties to the Bank.

44. Defendant worked closely with, and delegated the day-to-day implementation of his directives concerning the ALP's operation to, Yihou Han, who started as a Bank Teller and eventually was named Managing Director for Residential Lending. Han produced high volumes of Advantage Loans, and on information and belief, had an intimate, personal relationship with Seligman.

45. Defendant caused the Bank's management to give Han significant responsibility for (i) hiring loan officers (among her hires was Frank Hu, who pled guilty in March 2021 to conspiracy to commit bank fraud and wire fraud in connection with the origination of Advantage Loans); (ii) training loan officers; and (iii) establishing the ALP in Los Angeles and New York. Further, Seligman dictated Han's compensation structure. As a result, Han became the highest paid employee of the institution based on the commissions from her loan originations, many of which the Bank later learned were fraudulent.

46. Seligman made it clear to Bank employees that when it came to operating all aspects of the ALP, Bank staff were to defer to Han's wishes. If they did not, they would hear from Seligman directly. For example, in June 2017, the Bank hired a new employee to oversee loan processing. That employee tried to change the ALP's practice of allowing the top producing loan officers to select their loan

processors, as he believed that practice did not provide a sufficient control against misconduct.  Han informed Seligman of this change, and Seligman directed that the change be stopped, a move that directly contributed to the top producing loan officers conspiring with their chosen loan processers to originate fraudulent loans. In fact, after Seligman's direction that the change be stopped, Han worked together with her dedicated loan processor to send, or cause to send, hundreds of loan applications and supporting documents containing false and fraudulent information to the Bank's underwriting department.

47. In May 2021, Han pled guilty to conspiracy to commit bank fraud and wire fraud in violation of 18 U.S.C. § 1349 for her actions with respect to the ALP and, as part of that plea, Han admitted that she worked closely with and at the direction of Seligman, Lopp, Montemayor, and Steve Adams (the Bank's Senior Vice President and Regional Director with oversight over the Bank's California lending operations) to develop, expand, and manage the ALP, under which she originated more than 1,000 residential mortgage loans, the majority of which were fraudulent. Han also admitted that, with the knowledge and encouragement of senior management, including Seligman, Lopp, Montemayor, and Adams, she falsified documents and material information about borrowers' qualifications for the ALP and concealed material information about borrowers from the Bank's Underwriting

Department, in order to increase the volume of loans originated under the ALP, which, in turn, increased the Bank's revenue.

48. In addition to vesting responsibility for much of the day-to-day activities of the ALP to Han, Seligman also wielded his influence over underwriting processes and turn-around times in order to generate more Advantage Loans, faster.

49. Seligman aggressively pushed for Advantage Loans to be underwritten at an increasingly aggressive pace to the point where legitimate underwriting realistically could not be completed. He excoriated anyone who dared try to enhance the underwriting criteria to verify borrower information. He did so knowing full well about all the red flags of fraud associated with the origination of Advantage Loans, as discussed in the next section.

50. Seligman ultimately demanded that underwriting of any given loan must be completed in under 24 hours, without regard to whether proper underwriting could be completed in that timeframe.

51. Seligman also pushed to expedite the underwriting process by demanding the hiring of additional employees to serve as underwriters, regardless of experience, and insisting that other control measures not impede Advantage Loan originations.

52. As a result of Seligman's directives to prioritize speed over control measures, Bank employees originated a large volume of fraudulent loans. For

example, according to the plea agreement of Frank Hu, a loan officer who was hired by Han, he originated approximately 825 Advantage loans from 2015 to 2019, the overwhelming majority of which were fraudulent. Similarly, Amy Lu, another former top producing loan officer who pled guilty to conspiracy to commit bank and wire fraud, originated approximately 358 Advantage loans from 2015 to 2019, the overwhelming majority of which were fraudulent.

53. In addition, coordinating with Han, Seligman instructed the termination of employees whom he viewed as having unacceptable loan volume or what he deemed to be long underwriting times.

54. Defendant also demanded that enhanced underwriting procedures for self-employed borrowers be rolled back. Han informed Seligman that Adams told the lending team that the Bank was implementing a change in the procedure for verifying self-employed income. Instead of averaging deposits into a borrower's business bank accounts, the Bank would now require a Certified Public Accountant-prepared or Tax Preparer-prepared profit-and-loss statement, or another type of income letter prepared by the CPA or Tax Preparer. Shortly after Defendant learned of this, he sent scathing emails to Montemayor, as well as Adams and Managing Director of Lending Operations Randy Levine. Defendant informed Montemayor that the enhanced procedures crippled the ALP and demanded that Montemayor undo the policy in a hurry, and he told Levine and

Adams that the enhanced procedures brought the Bank to its knees.  The next morning, Montemayor informed Bank employees that the Bank would not require a CPA-prepared profit-and-loss statement as loan documentation.

55. In demanding the change, Seligman directly caused the Bank to originate fraudulent loans.  As one example, the very loan that caused management to suggest enhanced underwriting procedures for self-employed borrowers was fraudulent, but Defendant intervened to save Han's opportunity to originate the loan before the Bank's proposed control could have rooted out the fraud.  As a result, Han and others caused a loan application and supporting materials containing false and fraudulent information to be submitted to the Bank's underwriting department, which led to the origination of a $3.7 million loan.

### E. Awareness of Advantage Program Weaknesses

56. Defendant did all of the above knowing about red flags of fraud associated with the origination of Advantage Loans, including having knowledge of and encouraging Han to falsify documents and material information about borrowers' qualifications for the ALP and to conceal material information about borrowers from the Bank's Underwriting Department, in order to increase the volume of loans originated under the ALP, which, in turn, increased the Bank's revenue for a period of time.  Defendant took no action to address those red flags or ensure the ALP was in full compliance with all applicable laws, rules, and regulations.

57. To the contrary, in the face of numerous, repeated concerns raised to him by Bank management or employees, Defendant openly was hostile to implementing controls over the ALP that would ensure compliance with applicable rules and regulations, including the Ability to Repay rule, which he believed would significantly reduce the volume of Advantage Loans that could be originated.  In addition, as described above, Seligman consistently directed employees and officers of the Bank with respect to how they were to implement the ALP without putting in place the minimal guard rails to protect against the potential for fraud and other misconduct, despite being told repeatedly about the potential for fraud and other misconduct.

58. For example, when one employee raised concerns regarding potential fraud within the ALP directly to Defendant, Defendant responded: the borrowers are putting 35% down, why are you trying to be the FBI or the police?

59. Of course, as a Bank required to comply with the Bank Secrecy Act and other anti-money laundering laws and regulations, the Bank *did* have an obligation to implement controls to police for money laundering, among other illegal or illicit activity.  But Defendant viewed those obligations as an inconvenient obstacle to be avoided, knowing that he stood to benefit significantly from the increased origination of Advantage Loans.  He remained laser focused on only the short-term performance of Advantage Loans, intentionally ignoring that the Bank was

obligated to implement effective compliance controls and directly causing the weaknesses in the ALP that government regulators have since identified as fraudulent practices.

60. As another example, when Levine proposed to Defendant that the Bank should separate sales and operations personnel to be responsive to requests of the regulators, Defendant replied that invoking regulators is the "last refuge of scoundrels." Defendant later told Levine that if Levine had been at the Bank talking about regulation when the Bank started the ALP, the Bank would not have the ALP at all.

61. Additionally, in September 2016, Sterling was preparing to market pools of Advantage Loans for sale in the secondary market. In connection with that effort, Defendant worked with Bank management and personnel to develop the marketing materials. One employee flagged a number of questions and concerns regarding the ALP that he thought the Bank may run into when marketing the loans. Seligman reviewed this list of concerns, which unambiguously identified red flags of potential fraud or misconduct within the ALP, and yet he still took no action to address them. This makes sense given that, according to Han's plea agreement, certain fraudulent practices were undertaken "with the knowledge and encouragement" of Seligman.

62. As described above, Defendant continued to push for even faster underwriting turnaround times for the ALP over the next several years, and he continued to direct Bank employees and management with respect to how they were to implement the ALP without putting in place the minimal guard rails to protect against the potential for fraud and other misconduct, despite being told repeatedly about that potential. This was another instance where Seligman disregarded the Bank's obligations to comply with the Ability to Repay rule, the Bank's credit policies, and other rules and regulations governing the safe and sound operation of the Bank in favor of his own economic interests.

63. Bank management acceded to Defendant's demands, and in doing so breached their own duties to the Bank. Defendant continued to control the direction and operation of the ALP, continued to direct that the Bank take little or no action in the face of known risks with the ALP, and continued to actively conceal those risks from the Bank's independent board members, minority shareholders, purchasers of Advantage Loans on the secondary market, and government regulators, in order to prevent the discovery of his wrongful conduct and maximize his own profits. All of these actions by Seligman were directly adverse to Sterling's interests, and Bank management failed to stop Seligman or report him to the Bank's independent directors or regulatory authorities.

F.     **Defendant's Use of the Advantage Loan Program to Advance His Own Interests**

64. Defendant exercised control over the Bank's affairs and the ALP in order to inflate the Bank's valuation and profits, solely to maximize his own profits, without regard to compliance with the Ability to Repay rule and with the BSA/AML and other rules and regulations applicable to the Bank.

65. Historically, the Advantage Loan had been the Bank's most significant product.

66. As of December 31, 2010, prior to the launch of the ALP, the Bank had total assets of $724 million, total loans of $606 million, total residential loans of $316 million, and total stockholder's equity of $79 million.  When the ALP launched in 2011, the Bank closed the year with total assets of $762 million, total loans of $628 million, total residential loans of $360 million, and total stockholder's equity of $83 million.

67. Over the years, these metrics grew exponentially, due in large part to the ALP:  in 2013, the Bank closed the year with total assets of $981 million, total loans of $889 million, total residential loans of $668 million, and total stockholder's equity of $105 million.  By the end of 2015, these numbers had grown to $1.7 billion, $1.6 billion, $1.3 billion, and $133 million, respectively. By 2017, $3 billion, $2.7 billion, $2.3 billion, and $241 million. And by 2019, $3.25 billion, $2.9 billion, $2.5 billion, and $325 million.

68. In fact, just from the end of 2016 to when Sterling went public in 2017, total assets increased $472 million, or 21.8%, to $2.64 billion, primarily as a result of loan growth. Net loans increased $384 million, or 19.4%, to $2.37 billion at September 30, 2017 from $1.98 billion at December 31, 2016. And net income increased approximately $4.8 million to $38 million for the year ended December 31, 2017 from a net income of $33.2 million for the year ended December 31, 2016, primarily as a result of income from loan growth outpacing corresponding increases in expenses.

69. As of year-end 2019, residential real estate loans accounted for 85% of the Bank's entire loan portfolio. And 78% of the residential loan portfolio was comprised of Advantage Loans.

70. Between 2011 and 2019, the Bank originated at least $5 billion in Advantage Loans.

71. The ALP's volume and monetary success, which inflated Sterling's profits and overall valuation for the IPO, allowed Defendant to enrich himself through his stock ownership but years later it caused substantial harm to Plaintiffs.

72. Seligman designed and operated the ALP with the goal of maximizing his own personal gain in connection with Sterling's IPO at the expense of Plaintiffs. When the Holding Company went public in 2017, a decision that was made at Defendant's behest and under his control, Defendant's net proceeds from the

offering, through K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term

Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, and

Scott J. Seligman Revocable Living Trust, totaled nearly $73.7 million, nearly as

much as the Holding Company's proceeds, which totaled $85.5 million.

73. In addition, during the 18 months leading into the IPO, Seligman caused

Sterling to privately issue subordinated debt in an aggregate principal amount of

$65 million in multiple tranches (with the last such tranche issued in August of

2017, just three months prior to the closing of the IPO) that allowed for $45.25

million to be contributed into the Bank as a capital infusion (with the remaining

$19.75 million retained by the holding company, net of issuance expenses).  The

supplemental capital created a scenario where the Bank would not need as much

capital from the IPO (the Bank and Sterling each exceeded all regulatory capital

measurement requirements before the IPO) and thus allowed for Seligman and his

family's share of the IPO proceeds to be even larger than it otherwise might have

been.  This debt is still outstanding; it carried an above-market rate of 7% for the

first five years and now carries a floating rate of LIBOR plus 582 basis points.

74. In sum, Seligman enriched himself greatly through his stock ownership in,

and control of, Sterling.  He could not have done so had it not been for his

dishonest and reckless design of and control over the ALP that significantly

inflated Sterling's proceeds and valuation but later caused Sterling to become the target of law enforcement, regulatory authorities, and others.

### G.     Impact on Sterling

75. Defendant's conduct with respect to the ALP—both his actions and inactions—had a serious, negative, and costly impact on the Bank and the Holding Company.  Plaintiffs first faced that impact in June 2019, when the Bank entered into a formal agreement with the OCC relating primarily to certain aspects of its BSA/AML compliance program as well as the Bank's credit administration focused on residential lending.  Additional government inquiries then followed, as Plaintiffs began to face increasing scrutiny from government investigators related to or otherwise stemming from the ALP.  Plaintiffs have incurred great expense investigating the allegations, cooperating with the government inquiries, and making changes in response to them.

76. Plaintiffs have done so while facing tremendous opposition from Defendant, who—in an effort to fraudulently conceal his recklessness and wrongdoing and protect his personal profits—insisted that the government inquiries had no basis and that the inquiries be resisted and discounted.

77. Indeed, it was not until Plaintiffs undertook an extensive investigation of the allegations in connection with cooperating with the government inquiries that they discovered the nature and extent of Seligman's actions and inactions, and the

potential harm they could cause.  On December 9, 2019, Sterling announced that it had voluntarily suspended its ALP in connection with an ongoing internal review. As the internal review (which was led by outside legal counsel under the direction of a special committee of independent directors) progressed, it found that a significant number of employees engaged in illegal conduct in connection with the origination of a significant number of Advantage Loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation, and it revealed the nature and extent to which Seligman was involved in and responsible for the policies and practices that led to and encouraged this misconduct.

78. The OCC recently assessed a $6 million civil money penalty against the Bank for what it called violations of law and unsafe or unsound practices related to the Advantage Loan Program.  The Bank also is currently (i) responding to grand jury subpoenas from the Department of Justice ("DOJ"), and (ii) responding to a formal investigation initiated by the Securities and Exchange Commission ("SEC") that is related to the ALP.  The Bank is fully cooperating with these ongoing investigations, but adverse findings from any of them could result in material losses due to damages, penalties, costs, and/or expenses.

79. Prior to the OCC's announcement of the civil monetary penalty against the Bank, the Bank was subject to an OCC Formal Agreement that required the Bank

to: (i) establish a compliance committee to monitor and oversee the Bank's compliance with the provisions of the OCC Agreement; (ii) develop a revised customer due diligence and enhanced due diligence program; (iii) develop a revised suspicious activity monitoring program; (iv) engage an independent, third-party consultant to review and provide a written report on the Bank's suspicious activity monitoring; (v) develop revised policies and procedures to ensure effective BSA/AML model risk management for the Bank's automated suspicious activity monitoring system, which must be validated by a qualified, independent third party; (vi) ensure that the Bank's BSA Department maintains sufficient personnel; and (vii) develop revised policies and procedures to ensure effective controls over loan underwriting.  In addition to these requirements, while the OCC Agreement remained in effect, the Bank was subject to certain restrictions on expansion activities, such as growth through acquisition or branching to supplement organic growth of the Bank.  These changes and restrictions had a significant, deleterious financial impact on Sterling.

80. In addition, Sterling has incurred significant legal, consulting, and other third-party expenses in connection with (i) its internal review, (ii) its compliance with the OCC formal agreement, (iii) its cooperation with the OCC, DOJ, and SEC investigations, and (iv) defending civil litigation related to the ALP, including a class action securities suit brought in connection with statements regarding the

ALP during the IPO, and, most recently, a derivative demand from shareholders.

With respect to the latter, in an apparent  attempt to obtain discovery that would

assist him in his own defense against potential criminal charges, Defendant filed a

motion for discovery in the shareholder derivative litigation during the pendency of

the preliminary approval of the parties' settlement agreement in that action.

Although the Court denied Seligman's motion for discovery, the Bank incurred

additional expense to defend against it.

81.  Moreover, historically, the Bank's most significant product was its ALP,

but as a result of the permanent discontinuation of the ALP, the Bank's total

residential loan production has fallen dramatically below historical levels.

82.  Additionally, to avoid the uncertainty and expense of audits and inquiries by

third-party investors in ALP loans that the Bank sold to the secondary market

under Defendant's direction and at his behest, beginning at the end of the second

quarter of 2020, the Bank commenced making offers to each of those investors to

repurchase 100% of its previously sold ALP loans.  As of December 31, 2019, the

unpaid principal balance of residential mortgage loans sold under the ALP that

were subject to potential repurchase obligations for breach of representations and

warranties totaled $670.2 million.   And as of June 30, 2022, the Bank had

repurchased such loans with an aggregate principal balance of $273.8 million and

had entered agreements with investors to repurchase additional pools through July

2023, with an aggregate principal balance as of June 30, 2022 of $60.8 million. In total, through June 30, 2022, the Bank lost $11.3 million on these repurchased loans.

83. Finally, the Bank is a community bank, and its reputation is one of the most valuable components of its business. Negative publicity regarding the ALP, which was in large part caused by Defendant's control over the program, has already caused substantial damage to the Bank's reputation in the communities it serves, which can adversely affect its growth, results of operation, and financial condition.

84. Defendant's conduct was a direct cause of all of these actual and imminent harms to Plaintiffs. Under Defendant's power, control, and influence, and with both his knowledge and his encouragement, Bank employees engaged in illegal conduct with respect to the origination of a significant number of Advantage Loans in order to implement Defendant's direction to originate and underwrite more loans, faster.

### H.   Abuse of Sterling Resources

85. In addition to exercising control over the Bank's affairs and the ALP to maximize his own gain through Sterling's IPO, Defendant abused Sterling's resources to advance his own interests and profited substantially from Plaintiffs' dividend payments to him, to the detriment of Plaintiffs.

86. Because Defendant viewed Sterling as *his* personal property, he felt that he could do whatever he wanted with its funds.  For example, on one occasion he instructed Bank management to make a donation to a friend's cause using Bank funds.

87. At Defendant's demand, Sterling also contributed to the Seligman Family Foundation.  From 2014 to 2020, Sterling donated $4,525,000.00 to the Seligman Family Foundation.  The first year it donated $250,000.00, then the next year that donation was raised to $300,000 before elevating to $900,000 in 2016 at Defendant's request after the Foundation ran low on cash.  It remained at that level through 2019, and Sterling donated an additional $375,000 in 2020 before terminating such contributions.

88. Additionally, at Defendant's direction and for his personal benefit, Sterling made $1,698,663 in payments to other entities affiliated with and controlled by Defendant—311 California LP/tax Kiss LP CO, Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman & Associates, Inc., and Seligman Administrative Office—from 2013 through November 2020.  Sterling also paid Seligman $174,957 directly over the course of the same period.

89.  In addition, in April 2017, Sterling purchased Quantum Fund, LLC, a registered advisory business in which Seligman beneficially owned 80% of the membership interests and for which he received $2,336,000 through Scott J.

Seligman Revocable Living Trust and Joshua James Seligman Irrevocable Trust No. 1.  In December 2020, Sterling sold substantially all of the assets of Quantum at a loss to a third-party purchaser in an arm's-length negotiated transaction for an aggregate purchase price of $250,000 with an earn-out provision that at most could provide the Bank with an additional $750,000 over 2 years.  Further, between April 2017 and December 2020, Quantum incurred operating losses of approximately $6.6 million.

90. Moreover, from 2015 through 2020, Defendant and his family received a total of $28,307,633 in dividends, with approximately $19.3 million of this sum going to Seligman through K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, and Scott J. Seligman Revocable Living Trust.

91. Seligman increased his dividends through the Bank's issuance of subordinated debt in the 18 months leading up the IPO.  The purported purpose of the subordinated debt offering issuance was to supplement the Bank's capital to support additional growth but instead a significant portion of the funds from the debt issuance were cycled back out from the Bank to Sterling then from Sterling to Seligman and his family in the form of dividends.

***

92. In sum, by inflating Sterling's profits and valuations through his design and operation of the ALP in violation of rules, regulations, and principles of safe and sound banking, as well as by using Sterling as his personal piggy bank, Defendant enriched himself by more than a hundred million dollars but left Plaintiffs to face the consequences of his wrongdoing.

## **COUNT ONE: BREACH OF FIDUCIARY DUTIES**

93. Plaintiffs incorporate the previous allegations as if specifically alleged herein.

94. As someone who exercised power, influence, and control over the operations of the Bank and the Holding Company, including as controlling shareholder, Seligman owes fiduciary duties to Plaintiffs.

95. Seligman breached those duties.  He recklessly, and on information and belief intentionally, directed the implementation of inappropriate and unsafe lending practices and prevented adequate controls and compliance mechanisms to detect and control those lending practices.  At a minimum, he failed to adequately monitor and oversee the Bank's compliance efforts.  He took these actions in order to maximize his own IPO profits, at the expense of Plaintiffs.  In doing so, he acted in bad faith, failed to act with due care, and was disloyal to the Bank and Holding Company.

96. Defendant's breach was the proximate cause of substantial damages sustained by Plaintiffs, in an amount to be proven at trial.

## COUNT TWO: UNJUST ENRICHMENT

97. Plaintiffs incorporate the previous allegations as if specifically alleged herein.

98. Seligman received the benefit of Plaintiffs' dividend payments to him, as well as Plaintiffs' payments to Seligman-affiliated entities.

99. Seligman's continued retention of those benefits is inequitable and unjust. Independent of any breach of fiduciary duty, Seligman wielded his influence over Sterling to rule by fear and ridicule with the singular goal of benefitting himself. He should not be permitted to benefit from his mistreatment and misconduct.

100.     Plaintiffs are entitled to the return of Defendant's dividends and the payments Sterling made to the Seligman Family Foundation, 311 California LP/tax Kiss LP CO, Presidential Aviation, Inc., SM Farthington, LTD LLC, Seligman & Associates, Inc., and Seligman Administrative Office, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment:

A. Declaring that Defendant Seligman owed and breached his fiduciary

duties to Plaintiffs and unjustly enriched himself at Plaintiffs' expense;

B.  Awarding compensatory damages for the harm caused by Defendant's breach of fiduciary duty to Plaintiffs in an amount to be proven at trial;

C.  Ordering that Seligman disgorge his proceeds from the IPO;

D.  Awarding injunctive relief to Plaintiff (i) requiring Defendant to forfeit his voting shares in the Holding Company, including those held in K.I.S.S. Dynasty Trust No. 9, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, Scott J. Seligman 1993 Irrevocable Dynasty Trust, and Scott J. Seligman Revocable Living Trust or (ii) transfer those shares to a trust with a new independent trustee who would vote those shares in accordance with the votes of the minority shareholders so that Seligman can no longer wield power, control, or influence over Plaintiffs and which new trust would serve as a source of financial strength for Sterling;

E.  Ordering that Seligman repay to Plaintiffs all amounts by which he has been unjustly enriched in an amount to be proven at trial; and

F.  Awarding such other relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of any and all claims so triable.

Dated: October 7, 2022

By: */s/ Matthew J. Lund*

Robert S. Hertzberg (P30261)
Matthew J. Lund (P48632)
Troutman Pepper Hamilton Sanders LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
Telephone: 248-359-7370
Email: robert.hertzberg@troutman.com
         matthew.lund@troutman.com

David B. Bergman
Jayce L. Born
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Telephone: 202-942-5000
Email: david.bergman@arnoldporter.com
         jayce.born@arnoldporter.com

Oscar Ramallo
Arnold & Porter Kaye Scholer LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: 213-243-4000
Email: oscar.ramallo@arnoldporter.com

*Counsel for Plaintiffs Sterling Bank and
Trust, F.S.B. and Sterling Bancorp, Inc.*